**In re Lawrence H. DUBE and Janet M. Dube, Debtors.**

**Lawrence H. DUBE and Janet M. Dube, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Bankruptcy Nos. 92 B 13895, 92 A 00848.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 7, 1994.

("Lawrence") and Janet M. ("Janet") Dube to determine the dischargeability of their federal income tax debt. After considering the arguments and evidence presented, the Court enters these Findings of Fact and Conclusions of Law. This is a core proceeding over which the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## BACKGROUND

Lawrence Dube ("Lawrence") was a pilot, trained by the United States Airforce. He married three times, being twice divorced, with his last marriage to his current wife, Janet, in 1972. In 1977, Janet and Lawrence Dube ("the Dubes") experienced some turmoil in their lives which caused them to closely examine their religious beliefs. At about this same time, Lawrence a pilot with United Airlines ("United"), was to receive two large increases in pay.[1] Lawrence decided to devote his life to God and found a church (the "Dube Church").

The Dube Church articles of incorporation state the Dube Church was organized for the following purposes:

(1) to promote and encourage the dissemination of the Gospel of Jesus Christ through apostolic action;

(2) to hold regular teaching, prayer and worship services open to all, who would learn and practice the principles set forth in the Holy Bible, the Word of God, without regard to race, sex or national origin;

(3) to engage in charitable efforts for relief of those in need or distress, and to lessen the burden of government in this regard;

All to the glory of God.

The Dube Church had a Board of Directors which consisted of Lawrence, Janet and one other non-family member.

As part of founding the Dube Church, Lawrence took a vow of poverty. This vow of poverty stated he would not have any

Collins & Collins, Chicago, IL, for debtors/plaintiffs.

Barbara E. Seaman, Eugene Rossi, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This adversary proceeding comes before the Court on the complaint of Lawrence H.

---

**1.** One increase occurred when he was promoted to co-pilot of a Boeing 747 and soon thereafter, another increase was received when he was promoted to Captain of a Boeing 747.

property in his name, but it did not require him to live in poverty. In fact, the Dubes continued to live in their home, drive their cars and purchase the same household items. Lawrence conveyed the title of their home to the Dube Church on August 20, 1979. He also put the title of their cars in the Dube Church's name and made the Dube Church the beneficiary of his life insurance policy. The Dubes set aside part of their basement solely for worship. Otherwise, the Dubes continued the use and enjoyment of their facilities as before.

The Dube Church was originally affiliated with the Life Science Church. Both Lawrence and Janet received certificates of ordination from the Life Science Church. By affiliating with this established church, the Dubes stated that they thought they would receive guidance, both spiritual and practical. Further, the Dubes thought by affiliating with a church they knew to be tax exempt, they too would be covered by the affiliate church's tax exemption.

Soon thereafter, the Dube Church left the Life Science Church and affiliated with the Basic Bible Church. The Dube Church affiliated with and then resigned from several other churches [2] in the following years. Eventually, the name of the Dubes' Church was changed to the Church of the Holy Spirit. Part of the reason for the name change was that both the Life Science Church and the Basic Bible Church had a history of being "tax sham" churches. Lawrence knew this from articles in national magazines and newspapers.

In 1978, after creating the Dube Church, the Dubes stopped paying taxes. The Dubes' position was that all of their income and possessions having been assigned in the Dube Church, there was no taxable income to them. Lawrence stated he knew churches were automatically exempt from paying taxes so they did not file any forms with the IRS. Lawrence attempted several times to keep United Airlines from withholding taxes by providing false W–4 forms to United. For example, in May of 1978, Lawrence submitted a W–4 to his employer on which he claimed 85 allowances.

The Dubes began attending the Christian Assembly of God Church in Zion (the "Zion church") in 1979. They were baptized into the Zion church in June of 1980 and remained members of the Zion church until the Fall of 1983. At the time the Dubes were members of the Zion church, the pastor was Michael Ciociola and the Assistant Pastor was Douglas Carroccio. The Zion church created "cell-groups" for bible study and the Dubes hosted one of these cell-groups. The Dubes' cell-group was cancelled by Pastor Ciociola when Assistant Pastor Carroccio verified rumors that the Dubes were claiming the members of the Zion church were members of the Dube Church. The Dube Church never had a congregation of its own. The people who attended the Dube Church were parishioners of other churches.

At about this time, the IRS began communicating with the Dubes to determine why they had not been paying their taxes. The IRS sent numerous letters and eventually had two revenue officers visit the Dube household. Janet knew of these letters and of the visit of the officers. Janet also knew Lawrence had difficulty accepting that he had to pay the government taxes of any kind. Lawrence described taxes by using such terms as "unconstitutional income tax", "damn socialistic security tax", "money being stolen by the government" and as "federal tax confiscation."

Lawrence was convicted by a jury of willfully attempting to evade and defeat his income tax for the year 1981, of failing to file tax returns for the years 1981, 1982, and 1983, and of submitting three false Employee Withholding Allowance Certificates (form W–4) to United, his employer, during the later part of 1982.[3] Late tax returns for years 1978, 1979, 1980, 1981, 1982, 1983, and 1984 were filed in early 1986. There is no doubt

---

**2.** The Dube Church would pay these affiliate churches a fee and in exchange the Dube Church would receive a charter and usually Lawrence would be issued a certificate stating he was a minister of the affiliate church in question.

**3.** Further extensive findings regarding the Dubes' past can be found in *U.S. v. Dube,* 820 F.2d 886 (7th Cir.1987).

the Dubes performed numerous benevolent activities during the time in question.

In 1986, after retiring from United, Lawrence liquidated his pension fund in the amount of $239,830.41. He used some of the funds to pay his legal bills, some to fund Individual Retirement Accounts, and $125,000 was used to purchase a Life Insurance Annuity from Aetna Insurance Company ("the annuity").

Instead of proceeding to the Tax Court on the issue of the tax-exempt status of the Dube Church, the Dubes executed Form 870–AD, *Waiver of Restriction on Assessment and Collection of Deficiency in Taxes and Acceptance of Overassessment.* Form 870–AD finalizes the result of a tax examination such that the government is permitted to go ahead and assess tax penalties and interest and to begin the collection process. The issues in dispute are negotiated and are considered closed once the form is signed. In the Dubes' case, as a result of signing the Form 870–AD, fraud penalties were not pursued against Janet. In the late returns, the Dubes conceded that their earnings constituted income to them. They did, however, claim charitable and other deductions for the amount donated to the Dube Church. The Dube Church funds were utilized to pay all of the Dubes' living expenses and entertainment (if any) with the balance devoted to charitable purposes.

In the Form 870–AD proceedings, the IRS traced the income through the Dube Church. As a result, contributions which the Dubes could substantiate as having been made to qualified charitable organizations were all allowed as charitable deductions. Also, the Dubes' tax deficiencies were reduced.

On October 7, 1991, an assessment of the debtors' tax liability, including additional tax for the year 1986, was made. On October 21, 1991, assessments against the debtor for the outstanding tax liabilities, including additions to tax, for the years 1978 through 1985 and 1987, were made.

In January of 1992, Lawrence created the Lawrence and Janet Dube's Children's Trust ("the Children's Trust") of which Janet is the Trustee. On January 31, 1992, Lawrence transferred the $125,000 annuity he purchased when he retired from United to the Children's Trust.

On June 19, 1992, Dube filed a Chapter 7 bankruptcy and filed a ten count complaint to determine the dischargeability of the IRS assessments for the years 1978—1987.[4] The IRS responded by arguing the Debtors' taxes are not dischargeable under section 523(a)(1)(C). The IRS argues the debtors attempted to willfully evade their taxes by filing false W-4 withholding forms, failing to promptly file their taxes, using illegal deductions to evade taxes, creating a church to evade taxes, having the church pay personal expenses and purposely moving assets out of the IRS' grasp.

## ESTOPPEL

■ Both sides argue collateral estoppel should be applied to the previous decisions rendered in the IRS' attempts to collect taxes from the Dubes. Both sides point to Lawrence's criminal conviction in 1986 as estopping litigation over the issues already adjudicated in that proceeding.

The Seventh Circuit has affirmed the use of collateral estoppel in proceedings pursuant to section 523(a). *Klingman v. Levinson,* 831 F.2d 1292 (7th Cir.1987). In order for collateral estoppel to be applied in dischargeability proceedings, four elements must be present:

(1) the issue sought to be precluded must be the same as that involved in the prior litigation;

(2) the issue must have been actually litigated in the prior litigation;

(3) a determination of the issue in the prior litigation must have been essential to the final judgment; and

---

4. Each Count related to the dischargeability of the taxes for a specific year. For example Count I relates to taxes for the year 1978, Count II relates to taxes for 1979, etc. through Count X

relating to the year 1987. The Court also notes there are two Count IXs, one relating to 1986, one relating to 1987. The Court will treat the second Count IX relating to 1987 as Count X.

(4) the party against whom estoppel is invoked must be fully represented in the prior action.

*Id.* at 1295.

■ The burden of proof standard in the criminal proceedings was not the same as in the proceeding at bar. The District Court used "clear and convincing evidence" as the standard to determine whether Dube was liable for fraud. In the proceeding at bar "preponderance of the evidence" is the standard. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Using the higher standard the District Court found Lawrence guilty of willfully attempting to evade and defeat his income tax for the year 1981, of failing to file tax returns for the years 1981, 1982, and 1983, and of submitting three false Employee Withholding Allowance Certificates (form W–4) to United, his employer, during the later part of 1982. The Court finds that all four factors necessary to apply collateral estoppel have been satisfied and issue preclusion applies in favor of the government as to those findings. Thus, in this proceeding, it is established that Lawrence, in fact, was attempting to evade for the year 1981, failed to file for 1981, 1982 and 1983, and submitted false W–4 forms in 1982. However, the not guilty finding under the clear and convincing evidence standard does not estop the government in this case from attempting to prove its case by a preponderance of the evidence. Even though the district court did not find Lawrence guilty under some of the counts, under a clear and convincing standard, this court can find against Lawrence looking at the same facts under a preponderance of the evidence standard.

## DISCHARGEABILITY

### Section 523

■ Section 523 of the Bankruptcy Code provides that certain tax debts are not dischargeable in a Chapter 7 case.[5] The language in § 523 that is relevant to the instant dispute is:

[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for a tax ... with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

11 U.S.C. § 523(a)(1)(C). When deciding section 523(a)(1)(C) issues, willful conduct is read in accordance with other civil sections, denoting intentional, knowing and voluntary acts. *In re Griffith,* 161 B.R. 727, 733 (Bkrtcy.S.D.Fla.1993). The Court may use various kinds of circumstantial evidence or "badges of fraud" to infer fraudulent intent since direct evidence of such intent rarely exists. *Griffith,* 161 B.R. at 733; *In re Berzon,* 145 B.R. 247, 250 (Bankr.N.D.Ill.1992), *Hagaman v. Commissioner* [92–1 USTC P 50,141], 958 F.2d 684, 696 (6th Cir.1992); *Bradford v. Commissioner* [86–2 USTC P 9602], 796 F.2d 303, 307–08 (9th Cir.1986); *Loftin and Woodard, Inc. v. United States* [78–2 USTC P 9645], 577 F.2d 1206, 1238–39

---

5. Generally, in suits based on section 523(a)(1)(C), the burden of proving that the debtor's liabilities are nondischargeable is on the party asserting the debts to be nondischargeable, in this case, the IRS. *In re Cox,* 156 B.R. 323, 326 (Bankr.M.D.Fla.1993) *citing Tilley v. Jessee,* 789 F.2d 1074 (4th Cir.1986); *In re Lilley,* 152 B.R. 715, 720 (Bankr.E.D.Pa.1993); *In re Peterson,* 152 B.R. 329, 331 (D.Wyo.1993); *Matter of Brackin,* 148 B.R. 953, 956 (Bankr.N.D.Ala. 1992); *In re Berzon,* 145 B.R. 247, 250 (Bankr. N.D.Ill.1992). The IRS must prove nondischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Thus, the IRS will meet its burden if it shows that it is more probable than not that the Dubes willfully attempted to evade their taxes. *In re Berzon,* 145 B.R. 247, 250 (Bankr.N.D.Ill.1992). In the case at bar, the Court notes there is some ambiguity over which party bears the burden of proof. Since the Dubes initiated this adversary proceeding, as plaintiffs, they bear the burden of proof of showing their taxes are dischargeable since there is no constitutional or fundamental right to a discharge in bankruptcy. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). The burden should then shift to the IRS to prove that the taxes are not dischargeable because of the affirmative defense that the Dubes willfully attempted to evade or defeat their taxes. *See In re Lewis,* 151 B.R. 140, 142 (Bankr. W.D.Tenn.1992) (The Court ruled the plaintiff debtor had a burden of going forward to make a prima facie showing of dischargeability but that the government had the ultimate burden of proof and persuasion on the nondischargeability of the taxes at issue.). Under this Court's disposition, the burden of proof issue need not be decided.

(5th Cir.1978). These "badges of fraud" include: (1) the recurrence of the understatement of income for more than one tax year; (2) the understatement of income; (3) implausible or inconsistent explanations of behavior; (4) inadequate records; (4) transfer of assets to a family member; (5) transfer for inadequate consideration; (6) transfer greatly reduced assets subject to IRS execution; and (7) transfers were made in the face of serious financial difficulties. *Griffith*, 161 B.R. at 733; *Eyler v. Commissioner*, 760 F.2d 1129 (11th Cir.1985); *Douge v. Commissioner* [90–1 USTC P 50,186], 899 F.2d 164, 168 (2d Cir.1990); *Bradford* [86–2 USTC P 9602], 796 F.2d at 307–08; *Loftin and Woodard* [78–2 USTC P 9645], 577 F.2d at 1238–39.

The Dubes argue they created their church to serve God. The IRS argues the Dubes created the Dube Church and transfer funds to evade paying taxes to the IRS.

## THE TREATMENT OF A CHURCH UNDER THE TREASURY REGULATIONS

■ Although not binding on this Court, the analytical criteria developed by the IRS aids this Court's analysis. There is no Constitutional right for a church to be exempt from taxes. Section 501 of Chapter 26 of the United States Code, 26 U.S.C. § 501, deals with exemptions from tax. Section 501(c)(3) lists various exempt organizations which include "corporations ... organized and operated exclusively for religious [or] charitable ... purposes." Section 501(c)(3) does not define the term "church." "Church" is, however, defined in Treasury Regulation [6]

§ 1.511–2(a)(3)(ii), a regulation that pertains to organizations exempt from taxes on unrelated business income. The regulation provides in part:

(ii) The term "church" includes ... a religious organization if such ... organization

(a) is an integral part of a church, and

(b) is engaged in carrying out the functions of a church, whether as a civil law corporation or otherwise.

In determining whether a religious ... organization is an integral part of a church, consideration will be given to the degree to which it is connected with, and controlled by, such church. A religious ... organization shall be considered to be ... carrying out the functions of a church if its duties include the ministration of sacerdotal functions and the conduct of religious worship ... [which is to be determined based upon] the tenets and practices of a particular religious body constituting a church.

Treas.Reg. § 1.511–2(a)(3)(ii) (1994).

Religious organization must be both organized and operated for religious purposes (or any of the other purposes listed in § 1.501(d)). Treas.Reg. § 1.501(c)(3)–1 (1994). If the organization fails either test, it is not exempt. Under the organizational test of § 1.501(c)(3)–1(b), an organization's articles of organization must limit its purposes to one or more exempt purposes and not specifically empower the organization to engage, except insubstantially, in activities not in furtherance of one or more exempt purposes. Treas.Reg. § 1.501(c)(3)–1(b)(1) (1994). An

---

**6.** Treasury Regulations such as the ones before the Court were promulgated pursuant to the Treasury Secretary's general authority to "prescribe all needful rules and regulations for the enforcement of [the revenue laws]," 26 U.S.C. § 7805(a); it is an "interpretative" rather than "legislative" regulation. *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981). An interpretative regulation is not a statute, simply because the Treasury is not the Congress. *See Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can

be delegated by Congress...."). *See also Water Quality Assoc. Employees' Benefit Corp. v. United States*, 795 F.2d 1303 (7th Cir.1986). Courts ordinarily owe deference to a regulation that "implement[s] the congressional mandate in some reasonable manner." *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982) *quoting United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967). Rather broad deference is often given to Treasury Regulations. *See Fulman v. United States*, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978) (Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes" and "should not be overturned except for weighty reasons").

organization will not meet the organizational test unless its assets are dedicated to an exempt purpose; upon dissolution, its assets must, by operation of law or because of a provision in the organization's articles, be distributed for one or more exempt purposes and not distributed to its members or shareholders. Treas.Reg. § 1.501(c)(3)–1(b)(4) (1994).

■ The operational test requires that an organization's activities be primarily those which accomplish one or more exempt purposes as specified in section 501(c)(3) and not, except to an insubstantial part, those which do not further an exempt purpose. Treas.Reg. § 1.501(c)(3)–1(c)(1) (1994). Moreover, an organization is not operated exclusively for one or more exempt purposes unless it serves a public rather than private interest. Treas.Reg. § 1.501(c)(3)–1(d)(1)(ii) (1994). *See Baltimore Health and Welfare Fund v. Commissioner,* 69 T.C. 554, 1978 WL 3282 (1978); *Callaway Family Association v. Commissioner,* 71 T.C. 340, 1978 WL 3350 (1978). An organization must, therefore, prove that it is not operated for the benefit of private interests of individuals such as the creator and his family. *Basic Bible Church v. Commissioner,* 74 T.C. 846, 1980 WL 4474 (1980). Finally, the petitioner must prove that all or a part of its net earnings did not inure to the benefit of a private shareholder or individual. Treas. Reg. § 1.501(c)(3)–1(c)(2) (1994). A private shareholder or individual is a person who has a personal and private interest in the activities of the organization. Treas.Reg. § 1.501(a)–1(c) (1994)

■ Additionally, the IRS has developed fourteen criteria which it applies to individual organizations when determining whether the organization is a church:

(1) a distinct legal existence

(2) a recognized creed and form of worship

(3) a definite and distinct ecclesiastical government

(4) a formal code of doctrine and discipline

(5) a distinct religious history

(6) a membership not associated with any other church or denomination

(7) an organization of ordained ministers

(8) ordained ministers selected after completing prescribed studies

(9) a literature of its own

(10) established places of worship

(11) regular congregations

(12) regular religious services

(13) Sunday schools for religious instruction of the young

(14) schools for the preparation of its ministers.

Speech of Jerome Kurtz, IRS Commissioner, at PLI Seventh Biennial Conference on Tax Planning, Jan. 9, 1978, *reprinted in* Fed. Taxes (P–H) P 54,820 (1978). As one court has observed with respect to these criteria:

While some of these are relatively minor, others, e.g. the existence of an established congregation served by an organized ministry, the provision of regular religious services and religious education for the young, and the dissemination of a doctrinal code, are of central importance. The means by which an avowedly religious purpose is accomplished separates a "church" from other forms of religious enterprise.

*See Chapman v. Commissioner of Internal Revenue,* 48 T.C. 358, 367, 1967 WL 948 (1967) (Tannenwald, J., concurring). At a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship. Unless the organization is reasonably available to the public in its conduct of worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role. *American Guidance Foundation, Inc. v. United States,* 490 F.Supp. 304, 306 (D.D.C.1980).

■ The Dube Church passes the organization test. The Articles of Incorporation for the Dube Church mirror the listed requirements in Treas.Reg. 1.511–2(a)(3)(ii) (1994).

■ The Dube Church fails the operations test. The Dube Church does not have its own body of worshipers. The followers are "borrowed" from other churches, in particular, the Christian Assembly of God headed by Pastor Michael Ciociola. The Dube

Church does not have its own body of believers, the minimum requirement to be considered a church. The main believers served by the Dube Church serves are the Dube family members. They are the consistent direct beneficiaries of the church funds. The Dubes are charitable and perhaps even sincerely motivated in their good works. But good works and a belief in the Almighty do not by themselves give rise to a tax exemption.

## SECTION 523(a)(1)(C)

■ Lawrence has clearly vocalized his approach to payment of income taxes. His various activities here pursued his goal of evading and defeating the IRS. The facts in the case at hand lead to the conclusion the Dube Church was created to evade or defeat a tax. Specifically, the Dubes stopped paying their taxes in 1978 and soon thereafter began filing false W–4 forms. Almost all the worshipers the Dubes listed as members were identified as members of the Zion Church. No witnesses came forward and stated they were members of the Dube Church except for Lawrence and Janet. Lawrence made numerous negative statements about the IRS which reveal his intent to evade or defeat his taxes. Lawrence was convicted by a jury of willfully attempting to evade and defeat his income tax for the year 1981, of failing to file tax returns for the years 1981, 1982, and 1983, and of submitting three false Employee Withholding Allowance Certificates (form W–4) to United, his employer, during the later part of 1982. The late tax filings after the 1986 conviction do not vitiate his liability. Even after his conviction, the pattern of behavior of willfully attempting to evade or defeat taxes continued as Lawrence liquidated his pension in 1986 and moved it into a trust in 1992, out of the IRS' reach.

Further, the circumstances surrounding the creation of the church lead to the conclusion the Dube Church was founded with fraudulent intent. Almost all the Dubes' assets were transferred to the Dube Church without consideration. Lawrence also transferred his annuity to a trust controlled by Janet, a family member, in the face of serious financial difficulties. The Dubes willfully created this church to evade and defeat their taxes. The facts clearly demonstrate an ongoing pattern of conduct to evade and defeat the collection of taxes.

## JANET'S LIABILITY

■ Janet argues the tax liabilities should be discharged as they apply to her. Using the tax doctrine of being an "innocent spouse," Janet argues she did not willfully attempt to evade or defeat a tax. The IRS argues Janet was not an "innocent spouse," but rather had the necessary intent to evade and defeat a tax, and accordingly, she should not be discharged from the Dubes' tax debts.

As a general rule, liability is joint and several for tax, interest and penalties due with respect to a joint return pursuant to 26 U.S.C. § 6013(d)(3). However, an innocent spouse is not necessarily liable for a civil fraud penalty solely because she made a joint return, wherein the tax liability is solely attributable to the other spouse based on an attempt to evade a tax. The guiding precedents relating to innocent spouses is of assistance as to whether Janet should not be discharged from her tax liability.

What has commonly come to be known as the "innocent spouse" rule is codified in 26 USCA § 6013(e). The code provides as follows:

(e) Spouse relieved of liability in certain cases—

(1) In general—under rules prescribed by the Secretary, if—

(A) a joint return has been filed under this section for a taxable year,

(B) on such return there is a substantial understatement [7] of tax attributable

---

7. "Substantial understatement" is defined in subsection (3) as any understatement greater than $500. 26 U.S.C.A. § 6013(e)(3) (1994). Furthermore, an understatement is defined as the amount of the tax required to be shown on the return for the taxable year (minus) the amount of the tax imposed which is shown on the return, reduced by any rebate. 26 U.S.C.A. § 6662(d)(2)(A) (1994).

to grossly erroneous items[8] of one spouse,

(C) other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement and ·

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, THEN

The other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

The Seventh Circuit has held § 6013(e) to be Constitutional. *Quinn v. Commissioner of Internal Revenue*, 524 F.2d 617, 627 (7th Cir.1975). The requirements which the spouse must meet in order to gain relief were not found to be unreasonable or "in any way deny due process." *Id.*

▆▆▆ The burden of proof in an innocent spouse case is on the spouse seeking relief. *Busse v. United States*, 542 F.2d 421, 425 (7th Cir.) 1976. In order to gain relief the spouse must prove all of the subparts of § 6013(e)(1). *Id.* As the statute stands, relief is only granted for under-reporting, not nonpayment. Richard C.E. Beck, *The Innocent Spouse Problem: Joint and Several Liability for Income Taxes Should Be Repealed*, 43 Vand.L.Rev. 317, 364 (1990).

▆▆▆ In discussing the innocent spouse rule, the overriding guide on when to apply it

is fairness. *Id.* at 355. The four part test under § 6013(e)(1) is arguably, "little more than ritual formula that a court must recite in order to grant relief in sympathetic cases." *Id.* at 359. The Seventh Circuit has decided that it is the knowledge of the transaction which is omitted or fraudulent, not the knowledge of the tax consequences due to the omission or fraud that is to be considered. *Quinn v. Commissioner of Internal Revenue*, 524 F.2d at 626 *citing McCoy v. Commissioner*, 57 T.C. 732, 1972 WL 2489 (1972). Additionally, it is not merely a lack of knowledge which a spouse must show, but the spouse also has the burden of showing that they had no reason to know of the items in question. Beck, *The Innocent Spouse Problem*, 43 Vand.L.Rev. 317 at 351. The Fifth Circuit has adopted a standard of 'reasonable care' in its analysis of the phrase 'reason to know' in a leading case. *Sanders v. United States*, 509 F.2d 162, 167 (5th Cir.1975)[9].

Essentially the statute is meant to afford relief to the spouse in a joint return when the court finds that spouse to be 'innocent'. It is summed up in section 6013(e) which says, "taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax," 26 USCA § 6013(e)(1)(D) (1994). The decision on affording relief to an innocent spouse is based on equity.

▆▆▆ The Government has shown that Lawrence Dube' was guilty of attempt to evade or defeat his taxes. Since Lawrence is guilty and Janet participated and signed a joint tax return, then the burden of proof shifts to Janet to prove that she is an inno-

---

8. "Grossly erroneous items" is defined in subsection (2) as any item of gross income attributable to such spouse which is omitted from gross income and, any claim of a deduction, credit, or basis by ′such spouse in an amount for which there is no basis in fact or in law. 26 U.S.C.A. § 6013(e)(2)(A), (B) (1994).

9. The *Sanders* court set forth seven factors to be considered:
   1. Complexity of the guilty spouse's financial affairs.
   2. The innocent spouse's education, experience, emotional state and general subjective condition.

3. The degree to which the guilty spouse confided their business affairs to the innocent spouse.
4. The innocent spouse's trust in their accountant.
5. The degree and kind of the innocent spouse's participation in the guilty spouse's business affairs.
6. The extent of the innocent spouse's participation in their family budget.
7. The extent to which the couple had made lavish or unusual expenditures.
*Sanders v. United States*, 509 F.2d at 167.

cent spouse. *Busse v. United States, supra*, 542 F.2d at 425. Even if the Debtors proved she did not personally, intentionally evade taxes, she is not eligible for innocent spouse relief.

Janet has failed to show that she had no reason to know about Larry's attempts to understate his income. As one of three members of the board of the church, Janet had a reason to know of the finances of the church. The Dubes' claim that Janet worked almost exclusively on the benevolent programs of the church. However, benevolent programs require monetary expenditures. Therefore, it would be necessary for Janet to have some idea of the church finances so that she could know what benevolent actions could be accomplished.

Furthermore, Lawrence testified that for expenditures of more then $150 by the church, the approval of all three members of the church board was required. In an emergency a quorum of two board members could make the decision. Lawrence testified that sometimes that quorum involved Janet and the third board member. Consequently, the Debtors' own testimony is that Janet made financial church decisions without counsel from Lawrence. That creates a reason to know about church revenues. As stated earlier, Janet is not required to know the tax consequences of those revenues, only of their existence. *Quinn v. Commissioner of Internal Revenue*, 524 F.2d at 626 *citing McCoy v. Commissioner*, 57 T.C. 732, 1972 WL 2489 (1972).

In addition to Janet's involvement in the couple's business finances, she is involved in their home finances too. She is the trustee of the Dube Children's fund. This position requires her to be financially accountable and responsible for the fund. It would be impossible to perform under these requirements without some knowledge of the family's finances.

The Debtors argue that because Janet's tax returns were filed by her father and then by her husband, she did not have knowledge of the tax returns. There is simply too much evidence showing that Janet had every rea-

son to know that there were monies not being reported. Janet has thus failed to prove that she had no reason to know about the substantial understatement.[10] Therefore she has failed to prove that she is entitled to relief as an innocent spouse. She knowingly and voluntarily signed the joint tax return. She confided in her mother that she and Larry had all the money they would ever need. She received all the benefits of Larry's understating his tax liability and had reason to know that the tax liability was understated.

■ The same circumstances which lead to the conclusion Janet was not an innocent spouse lead to the conclusion she willfully attempted to evade or defeat a tax. She does not deny that she was aware of the formation of the Dube Church, the use of funds or of her husbands purposes. She has failed to show that she had no reason to know of the substantial understatements of tax attributable to grossly erroneous income. Janet had knowledge of the Dube family finances and knew the taxes due to the IRS were not being paid. The Court finds Janet willfully attempted to evade a tax in violation of section 523(a)(1)(C).

## CONCLUSION

For the reason stated herein, the Court finds Lawrence and Janet Dubes' debt to the IRS are nondischargeable according to § 523(a)(1)(C).

---

**10.** Applying the standards set out in *Sanders*   would lead to the same conclusion.